**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JACQUELYN BERRY,

        **Plaintiff,**

      **v.**                        **Civil Action 2:20-cv-5327**
                                      **Magistrate Judge Kimberly A. Jolson**

UNITED STATES POSTAL SERVICE,

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment. (Docs. 32, 33).  For the reasons that follow, Defendant's Motion for Summary Judgment (Doc. 32) is **GRANTED**, and Plaintiff's Motion for Summary Judgment (Doc. 33) is **DENIED.**

## I.    BACKGROUND

Plaintiff Jacquelyn Berry brings this action under the Fair Labor Standards Act ("FLSA") against Defendant United States Postal Service.  (Doc. 1).  Plaintiff began working for Defendant in 1989, when she was hired as a mail carrier.  (Doc. 27 at 11:14–12:5).  Around 2010, Plaintiff first worked in the Postal Service's 204-B detail.  (*Id.* at 13:21–14:6).  This is a temporary detail, in which an employee works as "an acting supervisor" and trains under permanent supervisors to learn how to manage and train postal clerks and carriers.  (Doc. 31 at 32:5–18; Doc. 27 at 23:9–24:7).  Plaintiff stayed in this detail for about a year.  (*Id.* at 14:4–6).

In 2016, Plaintiff again sought assignment to 204-B detail.  (*Id.* at 29:15–30:3).  Carrying mail "took its toll on [Plaintiff's] body" (Doc. 38 at 6), and she hoped that 204-B detail would help her transition into a permanent supervisory role, which would mean more longevity working for the Postal Service, and a better retirement package (Doc. 27 at 33:8–14).  Kelley Harris, the South

Columbus station manager, agreed to bring on Plaintiff as her trainee. (*Id.* at 29:15–31:1). Plaintiff began 204-B detail at the South Columbus station in January 2017. (Doc. 32-2, ¶ 6).

Around this time, Defendant was engaged in an audit of time records for all its Columbus employees. (Doc. 37-3, ¶ 2). The audit began pursuant to an agreement between Defendant and the union that represents letter carriers, after numerous employees filed grievances alleging deletions to their timeclock recordings. (*Id.*). A union team reviewed time records from 2011 to the present to determine "if there was any time for which employees were not compensated." (*Id.*, ¶ 4). Plaintiff was among the employees who were retroactively compensated due to the audit's findings. (*Id.*, ¶¶ 5–6).

The incident giving rise to the present action occurred on October 10, 2017, when Plaintiff worked an overtime shift. (Doc. 27 at 108:12–18). That day, she believed she made all her necessary timeclock recordings (or "clock rings," as they were called at the Postal Service). (*Id.* at 121:10–19). Yet, two days later, when she ran her time report, she saw adjustments had been made to her time record by her supervisor, Kelley Harris. (*Id.* at 108:24–109:11). Harris says this is because Plaintiff failed to make begin- and end-of-shift clock rings that day, and Harris had to manually enter Plaintiff's begin and end rings. (Doc. 32-2, ¶¶ 7–9). Plaintiff filed a grievance with the union to have the adjustments investigated. (Doc. 27 at 110:7–15).

The union investigated but found no evidence that Plaintiff had properly made her clock rings, nor that Harris had manipulated or deleted any clock rings. (Doc. 28 at 18:12–20:12) (testimony of Michael Brim, the union's regional grievance assistant). When Plaintiff was informed that the union would not be pursuing her grievance further—on a call with several union representatives and Harris—things between Plaintiff and Harris became contentious. (Doc. 39-15) (Michael Brim's witness statement describing "accusations and arguing"). Harris says that,

despite the union's conclusion, Plaintiff continued to accuse her of deleting clock rings.  (Doc. 31 at 42:3–43:10, 59:7–60:5).  So Harris expressed to Patrick LaRosa, Plaintiff's second-level supervisor, that she could no longer trust Plaintiff.  (*Id.* at 41:17–22).  LaRosa then had a meeting with Plaintiff—and removed her from 204-B detail.  (Doc. 27 at 198:13–199:10, 206:3–13).

Plaintiff carried mail for several more years, but ultimately retired in September 2020 because she "could no longer carry."  (*Id.* at 18:10–19:23).  Now, she brings this action against Defendant, claiming that she is entitled to unpaid overtime compensation on October 10, 2017 and eight other occasions that year, and that Defendant unlawfully retaliated against her for filing a grievance with the union.  (*See* Doc. 33).  Each party has moved for summary judgment (Docs. 32, 33), and the motions are fully briefed and ripe for consideration (Docs. 37, 38, 41, 42).

## II.    STANDARD

Summary judgment is granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When a defendant shows there is insufficient evidence to support any element of the plaintiff's claim and moves for summary judgment, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on which a reasonable jury could return a verdict in its favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Evidence is viewed in the light most favorable to the nonmoving party, meaning that "any direct evidence offered by the [nonmovant] in response to a summary judgment motion must be accepted as true."  *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004), *citing Liberty Lobby*,

477 U.S. at 251–52, and *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994). Ultimately, the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

## III.  DISCUSSION

### A.  Unpaid Overtime Compensation

"[A]n FLSA plaintiff must prove by a preponderance of the evidence that he or she performed work for which he or she was not properly compensated." *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012) (quoting *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999)). "[I]f an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process." *Id.* At base, when an employee fails to follow reasonable timekeeping procedures, she prevents her employer from "knowing its obligation to compensate" her. *Id.* And it is the employer's actual or constructive knowledge that is the central inquiry for these claims:

> At the end of the day, an employee must show that the employer knew or should have known that he was working overtime or, better yet, he should report the overtime hours himself. Either way, the employee bears some responsibility for the proper implementation of the FLSA's overtime provisions. An employer cannot satisfy an obligation that it has no reason to think exists.

*Wood v. Mid-Am. Mgmt. Corp.*, 192 F. App'x 378, 381 (6th Cir. 2006).

Defendant argues that Plaintiff has not adduced sufficient evidence to support her claim that she worked overtime for which she was not compensated. (Doc. 32 at 35–36). Further, it says Defendant cannot be liable for uncompensated overtime because Plaintiff failed to follow its reasonable timekeeping procedures. (*Id.* at 36–39). Namely, she neglected to make required clock

rings in the first instance; and then, after her clock ring error was known, she failed to submit the supplemental timekeeping form Defendant devised for such situations.  (*Id.*).  Plus, says Defendant, when Plaintiff followed procedure—by making her clock rings or submitting the form—she was always compensated for her time worked.  (*Id.* at 35, 38).

Plaintiff, however, maintains that she had overtime intentionally withheld on nine separate occasions.  (Doc. 33 at 7).  To the extent that there was a failure in following timekeeping procedure, she says that lies with Defendant for not *requesting* a timekeeping form from her when it discovered the clock ring error.  (Doc. 38 at 21).  She says this amounts to a failure to exercise reasonable diligence to determine her time worked, and Defendant thus had constructive knowledge of its obligation to compensate her.  (*Id.*).

The Court finds that the undisputed evidence of record cannot support Plaintiff's claim, and summary judgment must be granted to Defendant.  In addition, there are two factual disputes in the record which the Court ultimately need not resolve.  Even construing these disputes in the light most favorable to Plaintiff, the Court's conclusion as to summary judgment remains the same.

First, Plaintiff now claims nine different instances in which she was denied overtime compensation.  (Doc. 33 at 7).  Yet, when she was deposed, she only discussed one such instance, on October 10, 2017.  (*See generally* Doc. 27).  She further stated that, after reviewing her Employee Everything Report for 2017, which detailed all her time worked that year, she believed there were possibly two other dates on which there were discrepancies with her time.  (*Id.* at 170:3–171:5).  By a subsequent declaration, prepared just a few months later, she noted the nine dates she now relies on in her motion.  (Doc. 33-1 at 27–28).

The Court need not accept the declaration as admissible if it contradicts the prior testimony and there is not a persuasive justification for the contradiction.  *See Miller v. Food Concepts Int'l,*

*LP*, No. 2:13-CV-00124, 2017 WL 1163850, at *7 (S.D. Ohio Mar. 29, 2017).  As this Court has stated previously, "[i]f a witness, who has knowledge of a fact, is questioned during her deposition about that fact, she is required to 'bring it out at the deposition and cannot contradict her testimony in a subsequent affidavit.'"  *Id.* (quoting *Bradley v. Mary Rutan Hosp. Assoc.*, 322 F. Supp. 2d 926, 933 (S.D. Ohio 2004)).  Yet, without engaging in the persuasive-justification analysis, and accepting the declaration as admissible, the evidence still does not support Plaintiff's claim on any of the nine occasions.

Second, there is disputed evidence regarding statements made by Postmaster Ignatius Vaccaro.  In a March 3, 2017 email copied to dozens of employees, including Plaintiff's supervisor, Kelley Harris, Vaccaro asked, "Where was I not clear on the 204[-B]s not working overtime?" and specifically identified Plaintiff, along with a half-dozen other employees, as logging overtime.  (Doc. 33-1 at 9–10).  Similarly, on October 6, 2017, Vaccaro sent an email (to which Harris was not a recipient) questioning why Plaintiff and several other employees went into penalty overtime.  (*Id.* at 8).  Plaintiff also says she heard Vaccaro instruct Harris to take away Plaintiff's overtime on a teleconference, which she estimated occurred on or about October 11, 2017.  (Doc. 27 at 164:12–169:19).

Plaintiff views this as evidence that Harris was under pressure to manipulate time to reduce employee overtime beginning as early as March 3, 2017.  (*See* Doc. 33 at 6–8).  Harris says she understood Vaccaro's comments to be about not *scheduling* employees for overtime moving forward, not about deleting overtime already worked.  (Doc. 32-2, ¶ 15).  Even had Vaccaro's intention been to ask her to delete time, Harris says she never has, and never would, do so.  (*Id.*). But the Court need not rely on this disputed evidence, because even viewing it in the light most favorable to Plaintiff, it does not demonstrate that she worked overtime for which she was not

compensated. Even if Harris was motivated to manipulate employee time to keep overtime low, the record shows clearly that, when Plaintiff properly recorded her time, she was compensated accordingly. As will be described in more detail below, Plaintiff can point to no instance in which she made clock rings or submitted written timekeeping documentation and those recordings were disregarded or deleted.

The Court now turns to the relevant evidence of record. Because the deposition testimony centered on Plaintiff's compensation on October 10, 2017—and because an understanding of the evidence related to that date is largely illustrative of the other eight dates—the Court centers its discussion there.

First, there can be no genuine dispute as to the fact that Plaintiff failed to make clock rings on October 10. Making "clock rings," that is, using an employee identification badge on the electronic badge reader ("EBR") to register the time one begins work, is out to lunch, is in from lunch, and ends work, is any Postal Service employee's first and best method for reporting time. Plaintiff has maintained while pursuing this claim that she did make clock rings on October 10. (*See, e.g.,* Doc. 39-5) (EEO investigative affidavit in which Plaintiff affirmed that on October 10 she "clocked in using [her] time card on the EBR or time clock."). She continues to maintain that she did so. (Doc. 27 at 124:14–16).

Yet, Plaintiff's own testimony and the evidence of record do not support this contention. There are no begin tour ("BT") or end tour ("ET") clock rings registered under Plaintiff's unique EBR number on October 10. (Doc. 32-4 at 94). In other words, she did not clock in when she began work, or clock out when she finished. Clock rings (whether registered by the EBR or entered manually) are always maintained on an employee's timekeeping report, even when they are later "deleted" by a supervisor—that is, there is a record of the original clock rings and of the deletion.

7

(*Id.*, ¶ 9 (declaration of Tammy Eichelbrenner, Defendant's Time and Attendance Compliance Specialist); *compare id.* at 21 (Plaintiff's January 21 time record, in which her BT and ET EBR clock rings were deleted and replaced) *with id.* at 94 (her October 10 time record, in which no BT and ET EBR clock rings appear)).  Plaintiff confirmed in her deposition that her October 10 time report shows that she did not make BT and ET clock rings.  (Doc. 27 at 147:19–25).

If Plaintiff attempted to make clock rings, but none appeared in the system, this could only rationally be explained by an unsuccessful badge swipe or a malfunction of the EBR.  But Plaintiff testified that either of those situations would have been obvious to her when using the EBR.  She explained that successful badge swipes were indicated by a "ding" from the EBR; unsuccessful bad swipes were indicated by a different sound which was clearly audible and signaled to the employee that she would need to swipe her badge again.  (*Id.* at 38:8–12, 46:1–10; 47:24–25).  She further stated that when the EBR was operable it displayed the current time, but when it was inoperable it would display an error message and would either make the unsuccessful badge swipe sound or would remain silent when an employee attempted to swipe.  (*Id.* at 47:5–23).  Further, Plaintiff did successfully make her out to lunch ("OL") and in from lunch ("IL") clock rings on the EBR that day.  (Doc. 32-4 at 94).  At base, if Plaintiff had truly attempted to make her BT and ET clock rings on October 10, they would have been recorded or else would have been clearly unsuccessful, indicating to her the need to file a supplemental timekeeping form.  The evidence supports only one conclusion:  Plaintiff failed her first obligation to report her time by failing to make clock rings on October 10.

Still, Plaintiff had another chance to record her time.  Defendant's procedure provides that when an employee is missing EBR clock rings, "she is required to generate and submit to her supervisor a PS Form 1260 . . . for approval . . . ."  (*Id.*, ¶ 7).  Ultimately, it is the employee who

is "required to initiate [the 1260] form." (*Id.* at 11) (districtwide timekeeping memorandum detailing the use of various forms). Plaintiff testified that she would "have to prepare a 1260" if the EBR was inoperable or she otherwise missed clock rings. (Doc. 27 at 68:15–20; *see also id.* at 39:6–25, 46:25–47:4, 49:12–20, 66:16–21). The use of this form cuts two ways: because (1) an employee was required to submit a 1260 whenever they were in clock ring error, (2) a supervisor was not supposed to enter time for an employee in clock ring error without a 1260.

Kelley Harris acknowledges this. She testified that Defendant had a policy "to utilize a 1260 to put in the employee's time[,]" and that policy began to be more strictly enforced around 2015 or 2016, when the union presented clock ring grievances to management. (Doc. 31 at 17:4–24). She stated that prior to that period, time reporting in instances of clock ring error had often just been "verbal" between supervisors and employees. (*Id.*). Plaintiff testified that she was not aware of any prior instance in which Harris had entered time for her without a 1260. (Doc. 27 at 262:5–18). And to the extent that Plaintiff had to enter time for carriers in her 204-B detail, she testified that she never entered time without a 1260. (*Id.* at 262:20–25).

Harris, however, affirms that she entered time for Plaintiff on October 10 without a 1260. When Harris ran the clock ring error report that evening, she noticed Plaintiff had no BT or ET clock rings for the day. (Doc. 31 at 51:23–52:18). Harris knew she had authorized Plaintiff to work an eight-hour shift that day (*id.* at 56:5–20), so she "input time for her so she would get paid[,]" (Doc. 39-11 at 3). Employees on 204-B detail were supposed to take a one-hour lunch break. (Doc. 27 at 28:25–29:5). So Harris entered a BT and ET ring for Plaintiff which were nine hours apart (Doc. 32-4 at 94), accounting for her eight hours authorized time and a one-hour lunch.

In essence, Plaintiff argues that when Harris failed to observe Postal Service policy by informally inputting time without requesting a 1260, she failed to exercise reasonable diligence

9

that would have informed her of Plaintiff's actual time worked. (Doc. 38 at 21). Plaintiff says this amounts to "constructive knowledge" of her time worked. (*Id.*); *see Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 388–89 (6th Cir. 2016) (adopting the standard that an employer has constructive knowledge when, through the exercise of reasonable diligence, it should be aware of an employee's overtime work). But this argument attempts to plaster over two crucial facts established by the record: (1) Plaintiff herself never complied with her own timekeeping obligations by submitting a 1260; and (2) Plaintiff has never, and still cannot, state with particularity the time she actually worked that day. Said differently, it cannot stand to reason that Defendant failed to exercise reasonable diligence to determine Plaintiff's precise time worked when Plaintiff herself withheld that knowledge—or simply never possessed it.

Plaintiff made clear throughout her testimony that an employee would prepare a 1260 in response to virtually any timekeeping issue. (Doc. 27 at 39:6–40:11, 46:17–47:4, 49:12–50:18, 65:13–66:5, 66:16–21, 68:15–25, 69:10–16, 69:23–70:5, 71:18–74:12, 76:6–78:2). She also agreed with a statement from a Postal Service timekeeping memo (*see* Docs. 27-5 at 3, 32-4 at 11) that it was an employee's responsibility to initiate a 1260 when she was aware that she was in clock ring error:

> Q. So [the timekeeping memo] says the employee who fails to record their clock rings is required to initiate the form; is that your understanding of the procedure?
> A. If they know about it, if they know.

(Doc. 27 at 81:10–13).

Plaintiff testified that she first became aware of her October 10 clock ring error on October 12, when she ran her time report and noticed "adjustments to [her] clock rings . . . ." (*Id.* at 108:24-109:11). Upon discovering this, she says she sent a text message to Harris on the evening of October 12 asking about the time changes, but received no response. (*Id.*). The next day she asked Harris directly who was "changing" her clock rings, to which Harris did not respond. (*Id.* at

109:12–24). Plaintiff then asked her second-level supervisor, Patrick LaRosa, about changes to her clock rings, and he said he would look into it. (*Id.* at 109:25–110:4). After receiving no immediate response from LaRosa, she filed a grievance with the union. (*Id.* at 110:4–15).

What Plaintiff never did during this time, or any time thereafter, was document the hours she worked in a 1260. Nor did she tell Harris or LaRosa that her total time worked on October 10 exceeded what was recorded. Indeed, Harris represents that if Plaintiff had even informally told her that Plaintiff's hours on October 10 were different, she would have accepted those hours and changed her time accordingly. (Doc. 31 at 58:20–59:1). Plaintiff cannot point to any instance in which she submitted a 1260 and it was not accepted by Harris or any other supervisor. Simply put, Plaintiff abdicated her own responsibility to report her time.

Nor has Plaintiff been able—throughout any part of the process of pursuing this claim—to state the time she did work that day. When she prepared an affidavit for an Equal Employment Opportunity investigation into the claim, she stated no definite begin and end times for October 10 and affirmed, "I am not aware of specific time but I was the A.M. or morning supervisor." (Doc. 32-5 at 4). She only claimed that her time should have added up to eight hours. (*Id.* at 5). The time Harris entered would have amounted to eight hours, but Plaintiff took an hour-and-twelve-minute lunch that day. (Doc. 32-4 at 94). Now, Plaintiff speculates that she would have worked twelve minutes past her scheduled end time after taking twelve extra minutes for lunch. (Doc. 27 at 153:10–155:14).

When deposed for this action, Plaintiff admitted she took no contemporaneous notes about her time worked. (*Id.* at 116:2–6). So she could only speculate that she would have started the day at 6:00 a.m., because there was a teleconference for morning supervisors at that time. (*Id.* at 124:24–125:4). Harris declares that this morning teleconference occurred every day at 7:00 a.m.;

mail carriers had to call into the conference an hour before their shifts began, at 8:00 a.m., and supervisors reported on the carriers' schedules for the day.  (Doc. 37-4, ¶ 11).  Plaintiff further testified at her deposition that she worked that day until "about 4:00 or 5:00 [p.m.]" because she noted "carriers coming back in off the street[ ]" as she finished her shift, and that was her estimated time that carriers typically returned to the station.  (Doc. 27 at 124:24–125:4).  Later in her deposition testimony, she could not identify how much time she claimed was missing that day:

> Q. So what amount of time are you claiming was actually deleted?
> A. At this point I don't know, I don't know.

(*Id.* at 151:18–20; *see also id.* at 201:22–23 ("So I, myself, cannot pinpoint an exact time that I clocked in and clocked out.")).

Even now, in her Motion for Summary Judgment, Plaintiff vaguely argues that "[a]t a minimum, [she] worked between eight hours and [forty] minutes and at a maximum nine hours and [forty] minutes that day." (Doc. 33 at 16).  The fact that she never used a 1260 to report her time, never contemporaneously recorded her time in any other manner, and still cannot testify to the precise time she worked, makes Plaintiff distinct from the plaintiff in the constructive knowledge case she cites.  The bookkeeper plaintiff in *Craig v. Bridges Bros. Trucking LLC*, "meticulously documented and reported her time, regular and overtime."  823 F.3d at 388.  She only failed to apply the time-and-a-half overtime rate to the overtime hours in her report.  *Id.*  The Sixth Circuit held that, because the plaintiff's time worked was clearly documented and directly produced to her employer, summary judgment in favor of the employer could not stand.  *Id.* at 390–91.

Instead, this case is similar to *White v. Baptist Mem'l Health Care Corp.*, in which the Sixth Circuit affirmed summary judgment on an FLSA unpaid compensation claim for an employer when its employee failed to follow reasonable timekeeping procedures.  699 F.3d 869.

Like the employer in *White*, Defendant established reasonable process for reporting uncompensated work time and for correcting payroll errors. *Id.* at 872, 876–77. And, like the plaintiff in *White*, each time Plaintiff followed Defendant's procedures for reporting her time, she was compensated appropriately. *Id.* at 876; *see also MacEachern v. Quicken Loans, Inc.*, 2017 WL 5466656, at *5 (6th Cir. 2017) ("The record is clear that [plaintiff] did not always comply with the defendants' time-recording procedures. When he did follow those procedures, he received overtime pay . . . . Because [plaintiff] did not follow the established procedure for reporting the overtime he now asserts he is owed, the defendants are not liable for non-payment . . . ."). Thus, without evidence that Defendant prevented her from utilizing its reporting process, Plaintiff cannot recover damages under the FLSA. *White*, 699 F.3d at 877. Here, Plaintiff's testimony indicates that 1260 forms were readily available to employees (Doc. 27 at 74:5–12), and she adduced no evidence that she was prevented in any way from submitting the form—she just elected not to.

In sum, as to the October 10 time, there is no genuine dispute as to the fact that Plaintiff failed to make all her clock rings, which would have established a permanent record of her time worked. Further, it is undisputed that Plaintiff never submitted a 1260 to create a supplemental record of her time worked. Nor does she allege that she was in any way prevented from utilizing the above process. Further, Plaintiff has not offered evidence that she informally attempted to notify Defendant of her actual time worked; instead, she simply made accusations that her clock rings had been deleted. Accordingly, a reasonable jury could not find on her behalf regarding the October 10 unpaid overtime compensation claim. The same is true for the other dates on which Plaintiff now alleges her overtime was uncompensated.

On January 21, 2017, Plaintiff was compensated according to her own EBR clock rings. (Doc. 37-1, ¶ 3; Doc. 32-4 at 21). While the clock rings were adjusted, they were altered only to

reflect the role she was performing—that day, carrying mail, though her initial clock rings were logged under the designation for supervising deliveries—and the route she was working. (Doc. 37-1, ¶ 3). These designations were immaterial to Plaintiff's rate of pay, because at that time, whether she was carrying mail or supervising, she was being compensated at the higher 204-B-supervisor rate of pay, and when Plaintiff clocked a "move" ring to go to the street to deliver mail, the system automatically allotted her a supervisor's one-hour lunch. (*Id.*). Plaintiff says she should only have been allotted a half-hour lunch because that was the allotment for mail carriers (Doc. 41 at 9–10), but, as described, Plaintiff was being compensated as a 204-B supervisor regardless of whether she was carrying mail or supervising deliveries, and thus the one-hour lunch was appropriate. (Doc. 37-1, ¶ 3).

On March 9, 2017, Plaintiff was compensated according to her own EBR clock rings. (*Id.*, ¶ 4; Doc. 32-4 at 35). Harris says she mistakenly entered a BT ring (11.50[1], or 11:30 a.m.) a few minutes earlier than Plaintiff's EBR BT ring (11.55, or 11:33 a.m.), and immediately deleted it. (Doc. 37-4, ¶ 3). Plaintiff says that the earlier 11.50 BT was correct and done in accordance with a 1260 she submitted. (Doc. 41 at 10 (citing Doc. 38-2 at 3 (an email from Plaintiff titled "Berry has 1260 due to ebr morning issue. 11.50 BT"))). Yet, the email she cites was sent at 12:39 a.m. on March 9, 2017—that is, before the shift she now says the form was submitted for. It would appear the email was actually in regard to Plaintiff's immediately preceding March 8, 2017 shift, in which she failed to make a BT EBR ring, and Harris manually entered a 11.50 BT ring on her behalf. (Doc. 32-4 at 35).

On March 18, 2017, Plaintiff was compensated according to her own EBR clock rings. (Doc. 37-1, ¶ 5; Doc. 32-4 at 39). Harris mistakenly added an extra ET ring she intended to add

---

[1] Defendant's records render time by an hour 0 through 23, with a decimal indicating minutes in hundredths of an hour. Thus, 11.50 indicates 11:00 a.m. plus fifty-hundredths of an hour, or 11:30 a.m.

on a different date, and immediately deleted it. (Doc. 37-4, ¶ 4). Plaintiff does not support, or even claim, that she actually worked beyond her EBR ET ring or submitted a 1260 on this occasion. (Doc. 41 at 10). Rather, she seems to suggest, without cause, that she should be paid based on Harris's mistaken entry, and not on her own EBR clock ring. (*Id.*). This is unreasonable.

On March 23, 2017, Plaintiff failed to make an ET ring, but made her other EBR clock rings successfully. (Doc. 37-1, ¶ 6; Doc. 32-4 at 40). Harris entered three ET rings in quick succession, two of which she deleted, so that only one operative ET ring remained. (Doc. 37-4, ¶ 5). As on October 10, the ET ring which Harris maintained ultimately ensured that Plaintiff was compensated for an eight-hour workday. (*Id.*). Plaintiff does not assert that she submitted a 1260, despite her clock ring error. (*See* Doc. 41 at 11). Nor does she state how many hours she worked that day. (*Id.*).

On March 31, 2017, Plaintiff failed to make an ET ring, but made her other EBR clock rings successfully. (Doc. 37-1, ¶ 7; Doc. 32-4 at 42). Another supervisor, not Harris, seemed to mistakenly enter an ET ring of 20.78 before deleting it shortly thereafter and entering an ET ring of 20.32. (Doc. 37-1, ¶ 7). The ET ring which was maintained ultimately resulted in Plaintiff receiving eight hours of pay. (*Id.*). Plaintiff does not assert that she submitted a 1260, despite her clock ring error. (*See* Doc. 41 at 11). Nor does she state how many hours she worked that day. (*Id.*).

On April 8, 2017, Plaintiff failed to make an ET ring, and mistakenly made a "move" clock ring instead of an IL ring. (Doc. 37-1, ¶ 8; Doc. 32-4 at 45). Another supervisor, not Harris, corrected the move ring to an IL ring while maintaining the same time, and mistakenly entered an ET of 21.27 before deleting it shortly thereafter and entering an ET of 20.77. (Doc. 37-1, ¶ 8). The 20.77 ET, which was maintained, was provided by Plaintiff in a 1260. (Doc. 37-3 at 6).

Michael Brim, who was responsible for the letter carrier union's clock ring audits, affirms that this is the only 1260 that the union office has for "any of the nine dates on which [Plaintiff] is claiming overtime in this case . . . ." (*Id.*, ¶ 10). Plaintiff makes the seemingly disingenuous argument that she is entitled to the extra half hour that the mistaken ET entry would have yielded, because her "hours worked would have yielded exactly 9.0 with 1.0 hours for lunch and fit perfectly into Harris' scheme of entering time for 8.0 hours for employees." (Doc. 41 at 12). In other words, she says, because this supervisor "had to abide" by Defendant's policy of using the 1260 instead of entering eight hours of work (as Harris did on October 10), Plaintiff lost a half hour of time. (*Id.*). Plaintiff argument reveals, however, that had she initiated a 1260 on October 10, as on April 8, it would have definitively established her time worked.

On August 12, 2017, Plaintiff failed to make her OL and IL rings. (Doc. 37-1, ¶ 9; Doc. 32-4 at 80). Harris entered an OL ring of 15.00, an IL ring of 16.00, which she immediately deleted, and an IL ring of 15.51, which she maintained. (Doc. 37-4, ¶ 6). The IL ring she maintained ensured that Plaintiff was paid for eight hours. (*Id.*). Plaintiff only argues that Harris "had no idea how long [she] took for lunch[,]" but does not assert that she ever prepared a 1260 or indicated a different time for her lunch to Harris. (Doc. 41 at 12).

On September 23, 2017, Plaintiff made all her EBR clock rings, but she made three IL rings, all within the span of a minute. (Doc. 37-1, ¶ 10; Doc. 32-4 at 90). This put her in clock ring error, and two of the three rings had to be deleted for her payment to process. (Doc. 37-1, ¶ 10). So, Harris deleted the first and third of the three rings. (Doc. 37-4, ¶ 7). Plaintiff asserts "[t]here was no reason for [her] to swipe her badge three times absent an EBR malfunction." (Doc. 41 at 13). But the fact that every badge swipe registered into the system indicates there was no

malfunction.  And if Plaintiff believed there was an EBR malfunction, she testified she would submit a 1260 (Doc. 27 at 83:14–84:9), which she does not allege she did that day (Doc. 41 at 13).

The pattern that emerges from these dates is striking.  When Plaintiff made her EBR clock rings, or submitted a 1260, she was compensated accordingly.  But Plaintiff failed to make her EBR clock rings or submit a 1260 on numerous occasions.  Because the record is clear that Plaintiff failed to follow the established procedure for reporting time, Defendant is not liable for any of the alleged unpaid compensation.  Moreover, even viewing the record in the light most favorable to Plaintiff, she has not put forth sufficient evidence with which a reasonable jury could find that she actually performed work for which she was not compensated on any of the dates in question. Accordingly, with respect to Plaintiff's unpaid overtime compensation claim, Defendant's Motion for Summary Judgment is **GRANTED**, and Plaintiff's Motion for Summary Judgment is **DENIED**.

### B. Retaliation

The FLSA makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted . . . any proceeding under [the FLSA]."  29 U.S.C. § 215(a)(3).  Retaliation claims may be proven by direct or circumstantial evidence.  *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 1998).  "Direct evidence is evidence, which if believed, does not require an inference to conclude that unlawful retaliation motivated an employer's action."  *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 534 (6th Cir. 2011) (quoting *Spengler*, 615 F.3d at 491).  In the absence of direct evidence, the claim is governed by the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006).  Under that analysis, a plaintiff must first establish a prima facie

case of retaliation, proving "that (1) [ ] she engaged in a protected activity under the FLSA; (2) [ ] her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.* This prima facie showing creates a presumption of unlawful retaliation, which a defendant must rebut by proffering a legitimate non-discriminatory reason for the adverse employment action. *Id.* "If the defendant carries this burden, the plaintiff then must prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Id.*

Plaintiff argues that Defendant retaliated against her when Patrick LaRosa demoted her from 204-B detail to a regular carrier position following the denial of her grievance by the union. (Doc. 33 at 18–21). She says she can prove this through direct evidence. (*Id.* at 19–20). Specifically, she relies on her testimony that LaRosa asked her to sign a 1260 for October 10 after the union denied her grievance, told her "If you don't sign it, then you will go back to carrying mail tomorrow[,]" and demoted her when she refused to sign it. (Doc. 27 at 198:18–199:10). Alternatively, she says she can prove her prima facie case with circumstantial evidence and the record establishes that any legitimate non-discriminatory reason proffered by Defendant is pretext. (Doc. 33 at 20–21).

Defendant says Plaintiff's claim must fail because she cannot demonstrate a causal connection between her protected conduct and her demotion. (Doc. 32 at 41–45). Moreover, it says that it had a legitimate non-discriminatory reason to demote Plaintiff, because "Harris could legitimately no longer trust [Plaintiff] to be her 204[-B] supervisor after [she] made false allegations and then persisted despite the objective evidence and her own union's position." (*Id.*

at 47).  Further, it says Plaintiff has not adduced sufficient evidence to demonstrate that this reason was merely pretext.  (*Id.* at 50).

   i.   *Direct evidence*

First, the Court notes that Plaintiff has not adduced direct evidence of retaliation.  As described above, direct evidence requires no inference to conclude that unlawful retaliation has occurred.  *Pettit*, 429 F. App'x at 534.  Plaintiff says her testimony about a conversation with LaRosa preceding the demotion constitutes direct evidence.  (Doc. 33 at 19–20).  She testified that after the union denied her grievance, LaRosa asked her to fill out a 1260 for October 10, and when she refused, he said, "If you don't sign it, then you will go back to carrying mail tomorrow."  (Doc. 27 at 198:18–199:8).

The alleged remark makes clear that if Plaintiff did not fill out a 1260 she would be demoted.  Plaintiff suggests this unequivocally demonstrates retaliatory intent and that she "would not have been demoted to a carrier but for her report about the changes Harris made without her approval to her clock rings."  (Doc. 33 at 19).  But that is not clear.  Rather, it requires at least one major inference.  One would have to believe, as Plaintiff does, that LaRosa asked her to complete a 1260 to "ratify the false information Harris provided" regarding Plaintiff's time worked on October 10.  In other words, one would have to believe that LaRosa wanted Plaintiff to submit documentation to negate her meritorious FLSA grievance or else he would demote her.

Yet, as detailed extensively above, there was no evidence that Harris deleted clock rings or entered false information, and Plaintiff never affirmatively stated the time she did work that day.  And the union representatives who investigated Plaintiff's grievance found no evidence that Harris took time from Plaintiff that she worked.  (Doc. 28 at 18:12–20:12).  So, it does not clearly follow that LaRosa would have asked Plaintiff to complete a 1260 to ratify false information when the

union investigation found no evidence that the information *was* false. And there are other apparent explanations for LaRosa's behavior. For instance, he may have asked Plaintiff to submit a 1260 merely to comply with the proper procedure that all parties agree was ignored in the first instance here. A timekeeping procedure which, as an employee in 204-B detail, Plaintiff was tasked with upholding. (*See, e.g.,* Doc. 27 at 23:9–24:7 (Plaintiff describing her 204-B duties, among which was "time-keeping for carriers and clerks")). So, a reasonable factfinder could determine that LaRosa's comment was intended to mean that if Plaintiff could not abide by the timekeeping procedures she was meant to enforce on other employees, then she should not be in a supervisory position. And that intention is not clearly connected to a retaliatory motive related to Plaintiff's grievance.

Because the remark allegedly made by LaRosa requires additional inference to establish its retaliatory motive, it is not direct evidence. Thus, Plaintiff must establish a prima facie case with circumstantial evidence.

### ii. *Causal connection*

For the purposes of its Motion for Summary Judgment, Defendant assumes Plaintiff "has satisfied the first three elements of the prima facie case for retaliation" and focuses its attention on her failure to demonstrate causal connection. (Doc. 32 at 41 n.10).[2] Plaintiff again relies on

---

[2] In its response to Plaintiff's Motion for Summary Judgment, Defendant also challenges Plaintiff's ability to establish that she engaged in protected activity. (Doc. 37 at 51–52). Particularly, it suggests, "a complaint will only trigger FLSA protection if the employee lodges his complaint i) in good faith and ii) with an objectively reasonable belief that the employer's conduct was unlawful." (*Id.* at 51) (quoting *Spiteri v. AT & T Holdings, Inc.*, 40 F. Supp. 3d 869, 876 (E.D. Mich. 2014)). As described in the unpaid overtime compensation section of this opinion, the timekeeping records in this case, Plaintiff's refusal to comply with timekeeping procedures, and her inability to state her actual time worked, all establish that Plaintiff lacked an objectively reasonable belief Defendant was intentionally undercompensating her. This is so especially given Plaintiff's knowledge of Defendant's timekeeping system. Still, the Court must not grant summary judgment on a ground not affirmatively raised in Defendant's motion. Before granting summary judgment on grounds not raised by the movant, the Court must provide the non-movant "notice and a reasonable time to respond." Fed. R. Civ. P. 26(f)(2); *see also Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 514 (6th Cir. 2021). Here, however, the concern is academic, because summary judgment must be entered for Defendant on other grounds.

LaRosa's alleged statement to prove that her "demotion was directly related to her report regarding her changed clock rings." (Doc. 33 at 20). As described above, that statement could, but does not necessarily, suggest a retaliatory motive by LaRosa. And, in fact, the other evidence of record, including Plaintiff's time records (which show no BT and ET clock rings on October 10), the affidavits describing how Defendant's time system maintains records of all deleted clock rings, the union grievance investigator's testimony that there was no evidence Plaintiff was not compensated for time worked, and Plaintiff's repeated inability to claim the actual time she purports to have worked, cannot lead a reasonable factfinder to determine that LaRosa's motivation was to cover up changed clock rings by having Plaintiff submit a 1260, and demoting her in retaliation when she refused.

But in addition to this statement, Plaintiff relies on the brief amount of time between her grievance and demotion to support the causal connection. (Doc. 38 at 25–26). Particularly, she identifies that she filed the union grievance on October 13, 2017 and was demoted on October 27, 2017. (*Id.* at 26). Temporal proximity between protected activity and adverse action is "strong evidence" for establishing causal connection, but it cannot stand alone; rather, it must be combined with other evidence of retaliatory motive. *Pettit*, 429 F. App'x at 533. The fourteen days between Plaintiff's protected activity and adverse action is certainly proximate. *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 502 (6th Cir. 2013) (finding that a termination that occurred in the month following a discrimination complaint was proximate and collecting several cases in which proximity under three months was deemed sufficient). But Plaintiff cannot rely on the temporal proximity alone to establish a causal connection.

Plaintiff suggests Harris had a retaliatory motive and influenced LaRosa's decision to demote Plaintiff. (*See, e.g.,* Doc. 38 at 26) (suggesting Harris made a "false[ ] report[ ]" after

Plaintiff "reiterated Harris input her time incorrectly [following the union grievance meeting,] which Harris took as a personal attack and reported to LaRosa she could no longer trust [Plaintiff]"). Viewing the evidence in the light most favorable to Plaintiff, Harris did make statements from which a reasonable factfinder could infer retaliatory intent. For instance, when Harris was asked about Plaintiff's demotion and the loss of trust between them, she testified:

> It had nothing to do with the grievance. It was because when I tried to verbally talk to her afterwards, after she filed a grievance, me and the union steward are trying to talk to her and tell her, "hey, I did not delete your rings, hey, I didn't do anything wrong," she is still threatening to do something. She's still saying she wants something done to me. She's still accusing me of stealing from her and falsifying her clock rings. And she knew how serious that accusation was. She knew I could lose my job behind that. She knew she could -- when she filed a grievance, she knew I could lose my job for that. So for the life of me, I never understood what her motive was, and I couldn't trust her.

(Doc. 31 at 59:14–60:5). Particularly, Harris's reference to the seriousness of the accusation, and her feeling that such an accusation could result in her own termination, might suggest a motive to suppress grievances, including by unlawful retaliation.

Additionally, Harris testified that she was surprised when she first learned about the grievance at the formal hearing with the union, because typically a union representative initiated an informal meeting with a grievant and supervisor before that stage:

> And that was the first time that I had become aware of that, and that came from [Plaintiff's] mouth, that her and [the union steward] had been meeting on grievances. So to find all this out then, I didn't want -- I didn't feel the trust to have her as my supervisor anymore.

(*Id.* at 43:4–10). A reasonable factfinder could determine this statement suggests Harris felt undermined by subordinates filing grievances and acted with a corresponding retaliatory motive.

Because there is some circumstantial evidence in the record from which a reasonable factfinder could infer retaliatory motive, and because there is temporal proximity between Plaintiff's protected activity and adverse action, the Court will assume that Plaintiff can carry the

22

burden of establishing causal connection, and thus her prima facie case, for the purposes of summary judgment.

    *iii.*    *Pretext*

    Yet, assuming that Plaintiff has established a prima facie case, Defendant has carried its subsequent burden of proffering a legitimate non-discriminatory reason for her demotion. It says Plaintiff was demoted because of a lack of trust between her and Harris, which made Plaintiff working in a supervisory detail under Harris impracticable. (Doc. 32 at 45). "To raise a genuine issue of fact as to pretext and defeat a summary judgment motion under this position, [Plaintiff] must show that (1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate [Defendant's] action, or (3) the proffered reason was insufficient to motivate the action." *Adair*, 452 F.3d at 491. Plaintiff seemingly argues all three points, variously stating that Defendant's "legitimate non-retaliatory reason for [Plaintiff's] demotion has no basis in fact[,]" and also that its "alleged reasons . . . were insufficient to motivate and did not actually motivate [Plaintiff's] demotion." (Doc. 38 at 28).

    First, the Court notes that Defendant's proffered reason, on its face, is legitimate. It says that when Plaintiff continued to accuse Harris of deleting her clock rings, even after her own union told her there was no evidence indicating that was true and declined to pursue her grievance further, Harris could no longer trust Plaintiff to work in 204-B detail under her. (Doc. 32 at 47). Even "[a] mere conflict in personality and managerial style is a valid reason for discharge by an employer." *Land v. S. States Coop., Inc.*, 740 F. App'x 845, 849 (6th Cir. 2018) (citing *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982)). Certainly, an employer may take an adverse action against an employee when it honestly believes that employee made false

misconduct allegations. *Carrethers v. McCarthy*, 817 F. App'x 88, 89 (6th Cir. 2020) (collecting cases).

Second, a pretext argument that an employer's proffered reason has no basis in fact "may be defeated by conclusive evidence that the defendant 'honestly believed' its proffered reason, and that the belief was reasonably based 'on particularized facts that were before it at the time the decision was made.'" *Briggs*, 11 F.4th at 515 (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714 (6th Cir. 2007)). But, "[i]f there is sufficient evidence for a reasonable jury to find the employer did not have an honest belief in its proffered reason that was based on a proper investigation, summary judgment must be denied." *Id.* Plaintiff argues that because Harris and LaRosa both received the email from Postmaster Vaccaro stating, "Where was I not clear on the 204[-B]s not working overtime?" (Doc. 33-1 at 9–10), LaRosa could not have an honest belief that Harris no longer trusted Plaintiff; instead, she says, LaRosa must have known that Harris was merely acting under Vaccaro's instructions to "take time from 204[-B] supervisors[.]" (Doc. 38 at 28).

Yet, as there is not sufficient evidence for a reasonable jury to find that Plaintiff had her time deleted or was otherwise uncompensated for unpaid overtime, so too there is insufficient evidence for a reasonable jury to find that Defendant's employees were engaged in such a conspiracy to delete time for 204-B supervisors. And Defendant points to particularized facts on which LaRosa based his decision, which Plaintiff does not meaningfully rebut with countervailing evidence.

The record clearly establishes that the union investigated Plaintiff's unpaid overtime claim and found it was not meritorious. (*See* Doc. 37-3, ¶ 11) (declaration of Michael Brim, the union's regional grievance assistant, noting that "[t]he union withdrew [Plaintiff's] grievance because the

evidence did not substantiate her grievance and actually showed it to be false because she claimed she made all her own clock rings and that management deleted overtime rings").  The union reported this finding on October 27, 2017, at a meeting with several union representatives and Harris, which Plaintiff joined by phone.  (Doc. 27 at 189:17–194:22).  There is consistent agreement in the record that Plaintiff refused to accept the result of the union investigation and continued to accuse Harris of lying and deleting her clock rings in accordance with instruction from Postmaster Vaccaro.  Michael Brim stated that:

> We tried to explain to [Plaintiff] that there were no live rings for the begin tour and the end tour, but she was still adamant that she had made the rings.  After continued accusations and arguing, [ ] Harris stated something to the effect to [Plaintiff] that this has all stemmed from Postmaster Vaccaro on the telecom telling [ ] Harris to take out the unauthorized penalty time that [Plaintiff] had worked.  The conversation continued heatedly . . . .

(Doc. 39-15).  Another union representative, Charles Sanders, indicated the same:

> [ ] Harris stated this issue was in response to Postmaster [ ] Vaccaro instructing management to remove overtime hours that [Plaintiff] may not have been approved to work. [ ] Harris further stated, [Plaintiff] did not use her timecard to Begin/End Tour and she was manually entering her time to give [Plaintiff] an 8 hour day. [Plaintiff] notified both parties she worked more hours than indicated on the [timekeeping] [r]eports and she used her timecard on that day.  She further stated she also heard that Postmaster Vaccaro instructed management to delete her clock rings.

(Doc. 39-14).

In essence, Plaintiff continued to accuse Harris of misconduct even after it was explained to her that no evidence of misconduct existed.  This, Harris testified, was the reason she felt she could no longer trust Plaintiff to work in 204-B detail under her:

> I know the basis of [Plaintiff] being removed from South Columbus was because I could no longer work with her due to her comment on the phone with the union steward, and we're trying to tell her that, myself and the steward, are telling her that I did not delete her clock rings, that I didn't do anything wrong, and she is consistently stating that she wants something done to me . . . she just kept repeating, I deleted her rings, yes, I did, I deleted her rings, and that I was told to delete her

> rings. And I kept telling her, no, I didn't. And she would not come off of that. . . .
> I didn't feel the trust to have her as my supervisor anymore.

(Doc. 31 at 42:6–43:10). Harris informed LaRosa she could no longer trust Plaintiff because of what happened at the union meeting. (*Id.* at 41:17–22). And later, when LaRosa met with Plaintiff, Plaintiff continued to suggest that her time had been improperly deleted. (Doc. 39-14).

Simply put, "Harris could legitimately no longer trust [Plaintiff] to be her [204-B] supervisor after [Plaintiff] made false allegations and then persisted despite the objective evidence and her own union's position." (Doc. 32 at 47). The sticking point, in other words, was not that a grievance had been filed, but that Plaintiff was unwilling to accept the outcome of the grievance investigation and continued to accuse her supervisor of deceit. LaRosa, in turn, learned of all this from Harris, and then was able to observe Plaintiff's persistence in her belief himself when they met later in the day. Thus, there is conclusive evidence that both Harris and LaRosa honestly believed that a loss of trust had compromised the working relationship between Harris and Plaintiff, and that Defendant's proffered reason for Plaintiff's demotion has a factual basis.

Finally, looking to establish that this legitimate non-discriminatory reason did not actually motivate Defendant's action, Plaintiff recycles the indirect, speculative evidence from her causal connection argument. Namely, she relies on the emails from Postmaster Vaccaro, the comment Harris made in the union meeting suggesting Plaintiff was upset about Vaccaro's statements, and Plaintiff's otherwise unsubstantiated testimony that LaRosa told her to sign a 1260 form or else face demotion. (*See, e.g.,* Doc. 38 at 28–29). Taken in total, she says these establish that "Harris and LaRosa were in danger of losing their jobs if [Plaintiff's] claims could be substantiated and they demoted [Plaintiff] to stop [her] from pursuing her claims." (*Id.* at 29). But this is hardly sufficient evidence with which a reasonable jury could come to the same conclusion.

26

Tellingly, Plaintiff makes no attempt to adduce any comparator evidence, despite testifying that Postal Service employees file "grievances for any and everything." (Doc. 27 at 175:12–176:3). Harris agreed. (Doc. 31 at 40:16–41:3) ("Carriers file grievances all day every day."). Yet, Plaintiff cannot point to another similarly situated employee who suffered retaliation as a result of filing an overtime grievance. Nor can she point to another similarly situated employee who did not file a grievance, had a similar conflict with a supervisor, and yet suffered no adverse action. *See, e.g., Pettit*, 429 F. App'x at 537 (noting that "disparate treatment is probative of retaliatory intent"). And, as detailed above, Plaintiff also lacks direct evidence of retaliatory intent. While circumstantial evidence can still carry the day for establishing pretext, Plaintiff's circumstantial evidence relies on accepting in the first instance that Harris deleted her clock rings, a fact "blatantly contradicted by the record." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 769 (6th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

At base, the Court finds that, given the evidence of record, a reasonable jury could not find that Defendant's legitimate non-discriminatory reason for demoting Plaintiff was merely pretextual. Accordingly, with respect to Plaintiff's retaliation claim, Defendant's Motion for Summary Judgment is **GRANTED**, and Plaintiff's Motion for Summary Judgment is **DENIED**.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 32) is **GRANTED**, and Plaintiff's Motion for Summary Judgment (Doc. 33) is **DENIED.**


IT IS SO ORDERED.


Date:  June 6, 2022                              /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE